UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UCHE IKWUT-UKWA,         :   **CIVIL NO. 3:07-CV-01256**
                             :
        Plaintiff       :
                             :   (Magistrate Judge Smyser)
        v.          :
                             :
COMMONWEALTH OF PENNSYLVANIA   :
DEPARTMENT OF TRANSPORTATION,   :
                             :
        Defendant      :

## <u>MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

I. Background and Procedural History.

The plaintiff commenced this action by filing a complaint on July 11, 2007.

The defendant is the Commonwealth of Pennsylvania, Department of Transportation (PennDOT).[1]

The plaintiff, who was born in Nigeria, claimed in his complaint that he was subjected to wrongful discrimination while he was employed by the defendant in District 9-0 as a civil engineer. He alleges that he was discriminated against because of his race, his color and his national origin. He alleges that he was denied promotions as a result of wrongful discrimination. He

---

[1] By Order of January 14, 2009 (Doc. 52), the complaint as to former defendant Allen E. Biehler was dismissed.

also alleges that after he filed a complaint with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission in 2004 involving one particular promotion for which he unsuccessfully competed, the defendant retaliated and discriminated against him by denying other promotions, by denying tuition reimbursement, by denying leave time to him for employment-related education and by denying him compensation for duties he performed above and beyond those assigned to his position and pay grade. The plaintiff claims that throughout his PennDOT District 9-0 employment he was subjected to a hostile work environment because of his race, color and national origin. On April 7, 2006, he resigned. He claims that he was constructively discharged from his employment with PennDOT District 9-0.

The plaintiff brings his claim pursuant to Title VII, 42 U.S.C. § 2000e et seq.[2]

On August 31, 2007, the defendant filed an answer to the complaint.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c). A jury trial was not requested. An eight day non-jury trial began on February 17, 2009. Nine witnesses testified for the plaintiff. Seventeen witnesses testified for the defendant. Eighty-nine exhibits were received into evidence.

_____

[2] By Order of January 14, 2009, 42 U.S.C. § 1981 claims were dismissed.

II. Legal Standards

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an employee as to compensation, conditions of employment or privileges of employment because of the employee's race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(a)(1). The plaintiff alleges violations of Title VII in that, he alleges, he was discriminated against as to the matter of equal opportunity to advance through promotions and pay increases because of his race, color and national origin. He alleges, also, that he was discriminated against in violation of Title VII in that he was made to work in a working environment and under working conditions that were hostile to him based upon his race, color and national origin. He alleges, also, that he was constructively discharged in that the hostile working environment was intolerable from a reasonable person's perspective.

As to the plaintiff's claims of wrongful racial discrimination in having been denied promotions, we will analyze this case as a pretext case to which the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), applies. "This framework has three steps: (1) the plaintiff bears the burden of establishing a *prima facie* case of discrimination; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) if the defendant satisfies this burden, the plaintiff must then come forth with evidence indicating that the defendant's proffered

reason is merely a pretext." *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 619 (3d Cir. 1996). As to a claim of retaliation, an employee must show protected employee action, an adverse action by the employer after that, and a causal connection between the employee's protected activity and the employer's action. *Marra v. Philadelphia Housing Authority,* 497 F.3d 286, 300 (3d Cir. 2007).

There is no rigid formulation of a *prima facie* case under *McDonnell Douglas* and the requirements may vary with different factual situations. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997). Basically, a *prima facie* case is comprised of the following four elements: (1) the plaintiff belongs to the protected class; (2) the plaintiff was qualified; (3) the plaintiff was rejected; and (4) the employer selected an applicant with the plaintiff's qualifications. *Id.* at 939. As an alternative to the fourth element, a plaintiff can show that the position was filled with a person not belonging to the protected category. *Id.*; *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

If a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). An employer satisfies its burden of production by introducing evidence which would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id.* "The employer need not prove that the tendered reason *actually*

4

motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

The *McDonnell Douglas* framework will also be used in the analysis of plaintiff's claims of wrongful denials of tuition reimbursement, leave time and extra compensations for above-grade work, and we will consider whether there is proof that these employment actions were retalitory.

In order to prevail on his hostile work environment claim, the plaintiff must establish (1) that he suffered intentional discrimination because of his race, color or national origin, (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected him; (4) that the discrimination would have detrimentally affected a reasonable person in like circumstance; and (5) a basis for employer liability. *See Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006). "The analysis of the hostile work environment claim has a subjective and an objective component: the evidence must establish that the environment would be perceived by a reasonable person as hostile and that [the plaintiff] did, in fact, perceive it to be so." *Martin v. Allegheny Airlines, Inc.,* 126 F.Supp.2d 809, 820 (M.D.Pa. 2000), *aff'd,* 261 F.3d 492 (3d Cir. 2001). For harassment to be actionable it must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive

working environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). The United States Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult," that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57 (1986)). Whether an environment is hostile or abusive can be determined only by looking at all of the circumstances. *Harris, supra,* 510 U.S. at 23. The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

A person is constructively discharged from a job when "'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1084 (3d Cir. 1996)(quoting *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 888 (3d Cir. 1984)). To establish a constructive discharge, a plaintiff must demonstrate a greater severity or pervasiveness of harassment than that required to establish a hostile work environment. *Id.*

The testimony of the witnesses and the contents of the documentary exhibits will not be set forth herein. The following findings of fact, based in part upon the proposed findings submitted by the parties, do not contain every factual inference drawn by the fact finder from a lengthy trial record, but do contain findings upon the material factual issues.

The evidence has been considered in the context of the plaintiff's claims and allegations and in the context of the provisions of Title VII, as further discussed below.

III. Findings of Fact

1) The plaintiff, Uche Ikwut-Ukwa, is an adult, naturalized citizen of the United States who was born in Nigeria and whose skin color is black. He came to the United States in 1979 to attend college here. He did not return to Nigeria because of civil war there. He currently resides in Centre County, Pennsylvania.

2) The plaintiff received a Bachelor of Architecture, a five-year professional degree, from the University of Idaho in 1983; a Master of Science in Architectural Engineering degree, with an emphasis in Structural Analysis and Design, from the Pennsylvania State University in 1990; and a Master of Business Administration from Saint Francis University, Loretto, PA in 2003.

3) The plaintiff worked for several architectural and engineering firms for about seven years before, on November 4, 1996, he was hired by PennDOT as a Civil Engineer - Bridges, pay range 7, step 1, in PennDOT District 9-0, at a starting salary of $30,983.14. At the time of hiring, he possessed a professional architectural degree, an architectural engineering degree, and an Engineer-in-Training (EIT) certificate. He had passed the State Civil Service examination for Civil Engineer - Bridges.

4) During his tenure with PennDOT, the plaintiff was the only engineer in District 9-0 who was African-American and the only engineer in that District who was not born in the United States.

5) The plaintiff's work as a PennDOT civil engineer was consistently commendable. He had a thorough knowledge of his job and of related resources. He strived to expand his knowledge. He frequently recommended changes in procedures and methods as dictated by need.

6) On April 7, 2006, the plaintiff quit his PennDOT job, considering himself to have been constructively discharged because he considered himself to have been wrongly denied the opportunity throughout his PennDOT employment to advance according to his abilities and his accomplishments because of his race and his national origin. He felt that he had been subjected to hostile treatment based upon his race, his skin color and his national origin. He had competed for fifteen promotions, but had never

been promoted.  The plaintiff had filed four separate complaints with the Pennsylvania Human Relations Commission (PHRC) and the United States Equal Employment Opportunity Commission (EEOC).  He had received "Right to Sue" letters from the EEOC.  His annual salary at the time of his resignation was $49,036.92.

7)  Shortly after his hire in 1996, the plaintiff began to take actions to enhance his professional standing and to help him to advance in District 9-0.  At the instruction of the Assistant District Engineer – Design, the plaintiff took and passed the State Civil Service examination for the position of the Senior Civil Engineer Supervisor – Bridges.  He took and passed the national Professional Engineer (PE) License examination in or about October, 2003 and he was awarded the PE License in June 2004.

8)  At the recommendation of a former District Executive, the plaintiff sought and was granted rotation out of the bridge unit to gain additional experience.  He also obtained an MBA degree.  Taking the Civil Service examination for promotion, rotating to gain additional experience and seeking and receiving an MBA degree were known to the plaintiff to have been, for others, positive and  recommended steps for advancement in District 9-0.

9)  The plaintiff is a member of the Structural Engineering Institute, the American Society of Civil Engineers, and the Architectural Engineering Institute.

9

10)  The plaintiff applied for fifteen promotions.[3]  He was never promoted.  He also served in the position of Assistant Structural Control Engineer (ASCE), but he was not offered an opportunity to apply for that position.  He had performed the duties of the Structural Control Engineer, but he was not given an opportunity to apply for that position.

11)  All persons who were promoted, and the person transferred to the Structural Control Engineer position, are persons with white skin.

12)  A three-member panel selected candidates for promotions.  The panel system was adopted by former District Executive, Earl Neiderhiser, who was trying to end what he called the "good-old-boy network" system that was seen by Mr. Neiderhiser to be a system in which promotions and hires occurred based upon friendships and other relationships not necessarily related to merit and to bona fide occupational qualifications.  Despite Mr. Neiderhiser's efforts which had been implemented before the plaintiff's hire, all members of all promotion panels and all persons in the supervisory chain of command for all promotions involved in this case were white males, and the explanations and standards used by the panels to support selections are general, imprecise and subjective.

---

[3]  Only four adverse employment actions were within the limitation period and were exhausted thorough the EEOC and PHRC remedial processes.  Only these four form the basis for distinct Title VII discriminatory employment action claims.  The others are included within the plaintiff's hostile work environment and constructive discharge claims.

13)     The District follows a prescribed procedure to review candidates for promotion.  The procedure, although since modified, was initially established by Earl Neiderhiser.  The procedures were established in part to help integrate the three departments within the district:  design, construction and maintenance.

14)     The procedure designed by Mr. Neiderhiser was also designed by Mr. Neiderhiser to eliminate bias in promotions and to ensure against employees being promoted simply on longevity without regard to merit.

15)     Usually, promotion interviews within the District are conducted by panels of three individuals.  One of the individuals is the immediate supervisor of the position to be filled; the other two panel members are usually from other divisions within the Engineering District.

16)     The composition of the panels are normally approved by the Human Resources Officer and the District Executive.

17)     All eligible candidates are interviewed.  Questions to be asked of each candidate are submitted in advance to the Human Resources Officer who must approve the questions along with the District Executive and the particular Assistant District Executive.  The same approved questions are asked of each candidate in the same order by the same people.

18)   After all candidates are interviewed, the panel
meets and makes a recommendation, which has to be justified by the
panel.  That recommendation goes to the human resources officer
and the District Executive who may either accept or reject the
recommendation.  Most of the successful promotions candidates in
the instances where the plaintiff unsuccessfully competed for a
promotion were said by the panel members to have "interviewed
well."  The plaintiff was not found to have interviewed well.

19)   In or about January 2004, the plaintiff applied for
a promotion to the position of Senior Civil Engineer Supervisor -
Transportation to work as a project coordinator.  This was the
earliest of the promotions for which he competed for which he
exhausted administrative remedies.[4]  The plaintiff did not succeed
in his effort to be promoted.  He was found to lack a background
of responsible management assignments.  He was found to lack
construction scheduling experience.  The white male selected for
the position was found to have strong management and construction
scheduling experience.  The plaintiff had a different, more
academic, background.  The successful candidate had worked in a
county maintenance department and was known to a panel member.
Panel members were not restricted in any way as to the factors
that they could consider for promotions.  The selection process
was in essence subjective.  There is, however, not a basis to find
the panel's reasons to have been pretextual.  The panel's reliance

---

[4]   Earlier denied promotions are being considered as incidents relevant to
an within the scope of the plaintiff's hostile work environment and constructive
discharge claims.

12

upon management and scheduling skills was not a pretext for the rejection of the plaintiff based upon race, skin color or national origin.

20)  In or about August 2004, the plaintiff applied for a promotion to a Senior Civil Engineer Supervisor - Transportation position as a planning and programming engineer.  The plaintiff was denied the promotion.  The job was awarded to a white male whose education and experience do not appear to have exceeded the plaintiff's.  The successful applicant had not passed the fundamentals of engineering examination, was not certified as an Engineer-in-Training (EIT), and did not meet the job posting's requirement of a minimum of five years of on-the-job civil engineering experience and certification as an EIT.  The plaintiff was certified as a Professional Engineer, had two advanced degrees and possessed roughly fifteen years of field experience.  The reasons advanced for the non-selection of the plaintiff over the successful candidate had to do with answers given to questions about specific forms and programs, which forms and programs were used repeatedly in the job being filled.  This was not in the view of the fact finder a significantly merit-based reason for the selection, because knowledge of forms and programs could be readily acquired in the job.  Such knowledge would have been more accessible prior to the competitive process to someone having more interaction with District 9-0 co-workers then did the plaintiff. This seems to have been a reason based upon inside knowledge about the nuances of a particular job, not a reason based upon a more meaningful evaluation of candidates' knowledge and abilities.

However, the reason for the panel's decision is not seen to have been a pretext for racial discrimination.

21) Between February 15, 2005 and April 7, 2006, the plaintiff was assigned to perform the duties of an Assistant Structural Control Engineer (pay range 8) and sometimes those of a Structural Control Engineer (pay range 9) while being compensated as a Civil Engineer – Bridges (pay range 7). In or about February 2005, the plaintiff assumed the duties of Assistant Structural Control Engineer. He also performed duties of the Structural Control Engineer.

22) While working in the temporary role of Assistant Structural Control Engineer, the plaintiff approached his supervisor and asked for an increase in compensation. The supervisor told the plaintiff that if he didn't like it (i.e., working at a higher pay range position without higher compensation), he would be sent to the field to "chase blacktop trucks." The plaintiff planned to apply for the vacant position of Structural Control Engineer when in 2006 it became vacant. However, the job was not opened to competitive bidding. On or about March 11, 2006, Mark Hull, a white male of United States origin, was transferred to that position. This transfer was made despite the fact that, for several months, the plaintiff had been serving as the acting Structural Control Engineer after Garry Marks was promoted. The plaintiff had assumed the increased workload of the Structural Control Engineer with no additional compensation.

23) Mark Hull was transferred into the position that the plaintiff was temporarily performing. The transfer of Mark Hull into the vacant Structural Control Engineer position was proposed by Roger Dodson, a white male of United States origin. The vacant Structural Control Engineer position was never posted and no one ever spoke to the plaintiff about his desire to compete for the position as a permanent position. The plaintiff was not considered as a prospect to fill the vacancy, although District Human Resource Officer John Shovlin knew that the plaintiff would have applied for the position.

24) Mark Hull's qualifications for the Structural Control Engineer position were not superior to the plaintiff's qualifications for that position. The position, the duties of which the plaintiff had been performing, was given to Mark Hull without any competitive process. The plaintiff had no chance and was not considered. Mark Hull was given the position because the District 9-0 District Executive, Thomas Prestash, wanted to separate two relatives, one of whom who was supervising the other. The lateral transfer was made to prevent another employee from supervising his in-law.

25) Like the "good-old-boy network" basis for promotions, promotions made to accommodate the fact of multiple family members in the workplace has the effect of precluding consideration of an African-American engineer without family or friendship connections within the state agency.

26) The reasons stated for the exclusion of the plaintiff from consideration for the Structural Control Engineer position were that a two pay range promotion would not be consistent with District 9-0 personnel policy and that supervisory experience was required for this promotion.

27) Thomas Prestash and Roger Dodson both had received promotions that resulted in two pay range increases.

28) The Structural Control Engineer position requires, at most, supervision of only one employee — the Assistant Structural Control Engineer.

29) The reasons stated for the employment action of transferring Mark Hull to the position were not based upon intentional discrimination. Like other promotions and job filling actions, the reasons stated by the defendant's witnesses were probably the actual reasons. The reason probably was to avoid a supervisor's supervision of his brother-in-law, and accordingly was not a pretext for racial discrimination. The range of considerations probably never extended in a deliberate manner to the plaintiff's qualifications. However, Mr. Prestash was aware that the plaintiff wanted the position, Mr. Prestash had animosity against the plaintiff, and Mr. Prestash later taunted the plaintiff about the plaintiff's lack of success in obtaining the position.

30)  Mr. Prestash, the District Executive, with supervisory authority over the plaintiff, testified that he gave no thought or consideration to the plaintiff for the Structural Control Engineer position.

31)  Mr. Prestash, on another occasion, had sought the approval of the PennDOT Deputy Secretary for Administration for the appointment of an outside white candidate, whose husband was employed by the District, to a project manager position for which an inside candidate had applied as a promotion.  On that occasion, Mr. Prestash had argued that the outside candidate was "the only candidate that holds a master's degree which is in civil engineering with an emphasis in structural design. . . . District 9 expects an increase of structural related projects during the next few years.  The majority of [this candidate's] experience and education has been on structural design. . . . This type of expertise will greatly benefit District 9 in delivering this type of program."  Mr. Prestash knew and acknowledged in his testimony that the plaintiff in the matter of the Structural Control Engineer position had the same qualities.

32)  Departures in District 9-0 from written and unwritten policies to accommodate applicants with family or friendship relationships had a negative impact upon the advancement opportunity of an African-American engineer without family or friendship relationships within the state agency.

33)    The plaintiff timely filed charges of discrimination
with the United States Equal Employment Opportunity Commission
and the Pennsylvania Human Relations Commission concerning his
unsuccessful effort to obtain the 2004 Civil Engineer Supervisor -
Transportation promotion.  After the plaintiff filed those charges
of discrimination, PennDOT took adverse employment actions against
the plaintiff, a denial of tuition reimbursement, a denial of
leave time for employment-related education, and a denial of
higher compensation for performing duties of the Structural
Control Engineer position.  The reasons for denying the
plaintiff's requests were not pretextual.  The tuition
reimbursement and educational leave were denied because the
defendant did not want the plaintiff to be away from work for
twelve to fifteen hours a week.

34)    The plaintiff was not denied any particular
promotion as a result of intentional racial discrimination.  He
was not subjected to retaliation, after he had filed an EEOC
complaint, based upon filing that complaint.  The reasons for
particular employment actions were not pretextual.

35)    Although the defendant's reason was not pretextual
as to any particular employment action, the plaintiff, as an
African-American of Nigerian origin, was not afforded as much
consideration for promotions or for placements in to work
situations in which he would acquire experiences and exposures
that would enhance his candidacy for promotions as were other
white similarly situated PennDOT engineers.  This overlooking by

18

his superiors of his potential to be of use and to enhance his advancement potential made the workplace hostile for him as compared to other engineers whose potential for career advancement was greater.

36)  Based upon a combination of unsuccessful promotions efforts and particular racially toned occurrences, the plaintiff felt that he was subjected to a degrading and hostile work environment because of his race, color and national origin.

37)  Thomas Prestash, the District Executive of PennDOT District 9-0 as of 2006 and currently, and the top administrator for the District, had twice accused the plaintiff of unprofessional and improper conduct when the plaintiff and Mr. Prestash first worked together in 1997.  The first accusation was that the plaintiff had urinated in public view, and the second was that the plaintiff was sleeping during work hours.  The plaintiff had not urinated in public view.  He had not been sleeping during work hours.

38)  Thomas Prestash and the plaintiff each was working as a Civil Engineer - Bridges, in the Bridges Unit, when the plaintiff began working at District 9-0 in 1996.  There were unwelcome statements and conduct directed at the plaintiff from Mr. Prestash, comments that the plaintiff felt to be inappropriate and demeaning.  Mr. Prestash made "monkey sounds" directed to the plaintiff.  When Mr. Prestash first made the monkey sounds, in

1997, the plaintiff responded by comparing him to Fuzzy Zoeller.[5]
Fuzzy Zoeller had recently made comments about Tiger Woods,
comments thought by many persons to have been racially toned and
inappropriate.  Later, Mr. Prestash repeated the monkey sounds, in
2006, shortly after the plaintiff learned that he would not be
given the opportunity to apply for the position of Structural
Control Engineer.  Mr. Prestash had by then become District 9-0's
top executive, the District Executive, and was the decision maker
and in the Structural Control Engineer selection process.  In the
latter instance, after the plaintiff had received the adverse news
that the position Structural Control Engineer position that he was
performing would not become open for him to competitively seek,
Mr. Prestash had said to the plaintiff, "How's Uche feeling
today?"  Later, he said to the plaintiff "How's Uche really
feeling today?" and then made the same monkey sounds that he had
made nine or ten years earlier.  The plaintiff felt that the words
and sounds taunted him racially, suggesting to him that the
employer's action of denying to him the opportunity to compete for
the Structural Control Engineer position and the fact of Mr.
Prestash's superior position in combination with his animosity
against the plaintiff and other circumstances demonstrated to the
plaintiff that he was going to be unfavorably and unfairly treated
as to his aspirations for career advancement.  The plaintiff
considered his working circumstances to be hostile.  He was very

---

[5]  The plaintiff mistakenly referred to Fuzzy Zoeller, a professional
golfer, as "Buddy Zola" later in 2006 in his written complaint about Mr. Prestash's
conduct.  He may have used the name "Buddy Zola" when he responded to Mr. Prestash's
conduct in 1997 with that analogy.

pessimistic about the potential for improvement in his working
conditions and about his advancement potential.

39)   Although the plaintiff most intensely felt the
combined hostility of a lack of advancement opportunity and racial
hostility in April of 2006, he had felt there to be racial
hostility towards him from 1996 to 2006.

40)   Two years earlier, in 2004, Thomas Prestash and
Ralph DeStefano, who also held supervisory authority, had made
remarks to the plaintiff that the plaintiff felt carried demeaning
racial, national origin and sexual innuendo.  At times before the
2004 remarks, Mr. Prestash had made comments to the plaintiff
concerning the plaintiff's wife's status and income that the
plaintiff had construed as racially motivated and demeaning.  The
comments involved the plaintiff's wife's professional status, her
income and the place of residence of the married couple.  Later,
in 2004, Mr. Prestash in Mr. DeStefano's presence had invited the
plaintiff to go with him on a boating trip, stating as a condition
that the plaintiff must promise not to wear a "speedo" in front of
Mr. Prestash's wife.  The plaintiff considered the invitation not
to be sincere and to be a cruel joke.  When the plaintiff asked
why the condition not to wear a "speedo" was placed on the
invitation, Mr. DeStefano, who was with Mr. Prestash in the
district bridge room, answered that it was because the plaintiff
was a "stud muffin."  The two white men had laughed.  These
incidents had contributed to the perception by the plaintiff that

this working environment was hostile to him as an African-American.

41)   Mr. Prestash also had during the plaintiff's early District 9-0 years made derisive comments about the wealth of the plaintiff's wife, Dr. Shelley Stoffels, referring to the plaintiff's on-the-job professional attire and to the amount of property tax that the plaintiff paid on his family's house.  Dr. Stoffels is white.  The plaintiff perceived these comments as racially uncomplimentary and racially hostile.  These comments contributed to the perception of the plaintiff of a racially hostile workplace.

42)   The plaintiff was paid a lower salary than some white, American-born civil engineers, hired both before and after the plaintiff, who had less or similar experience and training. The plaintiff applied for numerous promotions for which he was qualified.  All of the promotions that were denied to the plaintiff were awarded to white employees.  In each promotion attempt, the plaintiff was denied the promotion.  Most of the promotions were awarded to a person who, as seen by the plaintiff, lacked qualifications and experience equal to or superior to the plaintiff's.  He felt that subjective reasons and pretextual reasons were stated for his non-selection.  The process, administered by white males in an environment where there were often familial and friendship ties among the decision makers, came to appear to the plaintiff to make it not reasonably possible for

a qualified African-American educated, experienced structural engineer to achieve advancement in District 9-0.

43)  In August 1998, the plaintiff had applied for a promotion to the position of Senior Civil Engineer Supervisor – Bridges.  The position was awarded to a white male.  The plaintiff was told that he was not awarded the position because he did not possess a Professional Engineer's License.  However, white males were promoted to Senior Civil Engineer Supervisor positions without possessing a Professional Engineer's License.

44)  In May 2000, the plaintiff had applied for Senior Civil Engineer Supervisor - Transportation.  The position was awarded to a white male.  The plaintiff had a discussion with a white male about this denial.  The white male responded derisively by laughing and asking the plaintiff "Who do you want to supervise?"  The plaintiff perceived the conduct and remark as an assertion that the plaintiff's race would preclude him from supervising white employees.  The white male who made that derisive remark was not a decision maker as to that promotion.

45)  In July 2001, the plaintiff again applied for Senior Civil Engineer Supervisor – Transportation.  The position was awarded to a white male.

46)  The plaintiff applied for two openings for the position of Senior Civil Engineer Supervisor – Transportation

(Construction Division) that were awarded to a white female and a white male.

47) The plaintiff applied for two Senior Civil Engineer Supervisor – Transportation openings that were awarded to two white males.

48) The plaintiff again applied for an Senior Civil Engineer Supervisor – Transportation that was awarded to a white male.

49) The plaintiff applied for four other positions that were awarded to white males.

50) At one point during the course of his District 9-0 employment, supervisors Brian Ayers and James Campbell instructed the plaintiff to not charge mileage or to take a travel time allowance for travel from his residence to a construction project site on the basis that his residence was outside the boundary of the district. Mr. Ayers and Mr. Campbell drove the route used by the plaintiff to check its length. It was later determined that the plaintiff had been in full compliance with regulations and was entitled to the mileage reimbursement and to the travel time allowance. The plaintiff perceived there to be a level of scrutiny directed towards his conduct that was not directed towards the conduct of others.

51) In September of 2004, the plaintiff's 2004 EPR (employee performance review) was revised downward, from a "commendable" rating consistent with all of his prior ratings to a "satisfactory" rating after the plaintiff had complained about discrimination. A "composite review" resulting in a lower rating was conducted. Composite reviews were not commonplace in District 9-0.

52) Other African-American District 9-0 PennDOT employees experienced day-to-day racially derogatory and insensitive conduct by their co-workers and perceived there to be a lack of opportunity for advancement for African-American employees.

53) The other African-American employees in District 9-0 believed that applying for promotions was a futile act. Robert Madden had applied for four or five promotions since 2003, and had received none. Don Winters, a twenty year PennDOT employee, had received two promotions based on seniority, the most recent in 1994. Mr. Winters has since applied for roughly five promotions, and has received none. Juanita Pattillo, a thirty year PennDOT employee, had received only one promotion during her tenure; it had occurred within her first two or three years of employment. Ms. Pattillo stopped applying because she had no political connections, and she felt that without such connections seeking advancement was futile.

54)　On April 7, 2006, the plaintiff resigned from his employment with the defendant PennDOT.  He considered himself to have been forced to resign his employment because of the racially degrading and hostile work environment, as he perceived it, the repeated denials of his requests for advancement, and the other discriminatory acts to which he felt himself to have been subjected.  He felt that he had no future at PennDOT, and that he had nowhere else within the Department to turn.  He resigned just after learning that he would not have the opportunity to compete for the Structural Control Engineer position that he was temporarily performing and just after the District Executive had taunted him about the occurrence ("How is Uche really feeling today?") and had repeated the monkey sounds that the District Executive, back then a Civil Engineer - Bridges like the plaintiff, had made when the plaintiff had taken offense at comments felt by the plaintiff to have been racially offensive.  Since then, District Executive Prestash had advanced from a Pay Range 7 to a Pay Range 14.  The plaintiff, despite his ambitions, education and efforts, remained a Pay Range 7.

55)　Towards the end of his employment, the plaintiff was very depressed.  His depression perniciously affected him and his family.

56)　When the plaintiff was denied the chance to apply for the position that he had been *de facto* performing (Structural Control Engineer), he was very disheartened and depressed.  He felt that he had no choice but to leave PennDOT.

57)  The plaintiff suffered discrimination in the form of a hostile work place because of his race, color and national origin.

58)  The discrimination was severe.

59)  The discrimination detrimentally affected the plaintiff.

60)  The discrimination would have detrimentally affected a reasonable person in like circumstances.

61)  The discrimination occurred by and through supervising employees of the plaintiff and gives rise to a basis for employer liability.

62)  The employer knowingly permitted intolerable conditions of employment discrimination in District 9-0.

63)  The plaintiff was subjected to a hostile work environment.  He suffered a denial of career development and advancement opportunities, which along with overt workplace hostility caused him emotional injury.

64)  The plaintiff was frustrated and was caused to feel depressed and that his efforts to achieve promotions as an engineer in District 9-0 were futile, and was caused to feel that

his District 9-0 employment circumstances were hostile to him as a result of his race, his color and his national origin.

65)  The plaintiff's frustration, depression and sense of futility were caused in part by actual hostile expressions of racial, color or national origin discrimination on the part of persons who occupied positions superior to his position in the District 9-0 hierarchy of engineers.

66)  The plaintiff's frustration, depression and sense of futility were caused in part by his perception that the engineering hierarchy in District 9-0 was hostile to him on the basis of his race, color or national origin in that, despite his education, qualifications, experience and skills, he could not achieve a promotion or identify the merit-based factor(s) that would enable him to attempt to enhance his competitive position in his effort to achieve promotion.

67)  The hostile work environment that the plaintiff encountered and experienced was one where the hostility was present in the form of racially hostile words and conduct of fellow employees, including fellow engineers on levels equal to and above the level of the plaintiff, and in the form of a process and standards for promotions and advancement that did not enable him to compete for promotions under promotion procedures and standards that were reasonably designed and intended to result in the selection of the most qualified candidate and to not discriminate on the basis of race, color or national origin.

68)  The frustration of efforts of the plaintiff to achieve promotions as an engineer in an employment setting where the employer defendant had not taken adequate steps to achieve promotion procedures and standards that would result in the selection of the most qualified candidate for promotion in engineering positions and that accordingly would not wrongfully discriminate on the basis of race, color or national origin, and that in this workplace contributed to the plaintiff's perception of a hostile workplace and to his sense of futility and his depression, was a part of the injuries that the plaintiff suffered.

69)  With the exception of the evidence that a former District Executive revised the promotions process in District 9-0 in an effort to end the "good old boy" preferences inherent in the previous promotions process, there was no evidence presented of any analysis of the District 9-0 promotions process and standards, and of job definitions and qualifications, to achieve promotions procedures and standards that would result in the selection of the most qualified candidate and that in this workplace would not wrongfully discriminate on the basis of race, color or national origin.

70)  The employer defendant had not taken adequate steps prior to or during the plaintiff's employment as a District 9-0 engineer to achieve promotions procedures and standards that would result in the selection of the most qualified candidate for promotion in engineering positions and that in this workplace

would not wrongfully discriminate on the basis of race, color or national origin.

71) The plaintiff has not exhausted administrative remedies as to any but four employment action grievances that he brought in 2004, 2005 and 2006. He has not exhausted EEOC or PHRC remedies as to approximately twelve denied promotions during the years from 1996 to 2004. It is not disputed that he has exhausted EEOC and PHRC remedies as to promotion opportunities in 2004, 2005 and 2006, as to a claim of a retaliatory denial of requests by him for certain job benefits and as to his claims of a hostile work environment and of a constructive discharge.

72) Although no one specific promotion decision as to a position sought by the plaintiff was denied to the plaintiff on the basis of a reason that was a pretext for racial discrimination, the plaintiff was subjected to racial and national origin discrimination in the process of seeking promotions and advancement in District 9-0 because of a combination of selection practices that did not reasonably assure the selection of the most qualified candidate, the fact that relationships between white male candidates and selectors carried a lot of weight, and the existence of racial animosity on the part of some District 9-0 supervisors. The defendant, in District 9-0, through the District Executive and other supervisory personnel, followed an employment practice of not providing meaningful and adequate consideration for promotion and advancement to an African-American engineer with qualifications warranting such consideration.

73) The plaintiff had the opportunity on April 7, 2006 to explore the possibility of a transfer to another PennDOT district instead of resigning. This was proposed to him by Roger Dodson at the April 7, 2006 exit interview. (Dft. Exh. 36; Tr. Day 6, p. 130, 1.6; Doc. 93).[6] It was not reasonable for him not to take that opportunity. A reasonable person in the plaintiff's position would not have decided that there was no other choice but to resign. The number and range of state wide career opportunities for a structural engineer in PennDOT was not explored by the plaintiff.

74) A reasonable person subjected to the conditions of discrimination to which the plaintiff was subjected, in the light of all of the circumstances and given the possibility of an opportunity to transfer to another PennDOT district, would not have precipitously and immediately resigned.

75) Although the plaintiff did face a hostile work environment, a reasonable employee in his place would not have resigned. The problems that he faced were, most of the time, problems involving frustrations about career advancement. He experienced work hostility principally from one supervisor, Thomas Prestash. Although Mr. Prestash's position as District Executive

---

[6] The plaintiff did not confirm that Mr. Dodson had made this offer. (Tr. Day 8, pp. 85-87). We credit Mr. Dodson's memory of this, noting his same day memorandum, and do not suspect fabrication. The plaintiff, in any event, knew that he was working in one district of a statewide agency, and we do not consider a state of mind that his District 9-0 experiences would be replicated in another district to be reasonable.

caused hostility from him to take on added importance, the plaintiff's resignation was not his only reasonable course of action. He was working for a state agency. Avenues of redress were not unavailable to him. It was more reasonable for him to continue his state agency employment and to challenge incidents of perceived discrimination than to quit his employment.

76) The plaintiff erred in resigning in part because he failed to consider all of the relevant factors. He failed to consider, in particular, changing and evolving standards, expectations and perspectives within the workplaces of Pennsylvania and the United States that could cause the obstacles he perceived to be minimized or eliminated, and he failed to consider the effect of his departure, compared to the other choice, upon that process. He also failed to consider his own identifiable job-related weaknesses or short comings, such as his communication skills, and the potential effect that efforts to improve those weaknesses would have upon his career advancement objectives if he chose not to resign.

77) The plaintiff's English language communication skills are good, but not excellent. His English grammar and vocabulary skills are good. His pronunciations are in some instances not good. Some listeners may be required, to be certain of understanding him, to request him to repeat words and phrases. He also does not always understand words spoken by other persons. It is an example of this that he misunderstood the pronunciation or the spelling of the name "Fuzzy Zoeller". In the PHRC Forced

Resignation Questionnaire that he completed in April of 2006, (Pl. Exh. 63), he referred to "the one time K-Mart spokesman and retired professional golfer who made derogatory racial remarks about Tiger Woods" as "Buddy Zola". He gave inadequate consideration to his own communication shortcomings in deciding that his reasonable course of action was to resign rather than to challenge adverse job actions and explore transfer possibilities.

78) Although no one specific promotion decision favoring another employee over the plaintiff was based upon pretext, the plaintiff was injured over the course of ten years in pay, interest and lost opportunity by reason of having not been able to compete for promotions on an equal basis. This injury, while not precisely quantifiable, was a part of the injury caused by a work environment reasonably perceived by the plaintiff as hostile.

79) Assuming *arguendo* that the reason for the process followed by Mr. Prestash in the placement of Mark Hull into the Structural Control Engineer position was a pretext for race, color or national origin discrimination against the plaintiff, the plaintiff's resignation at that time precluded a lost-pay-based calculation of damages for that adverse employment action itself. The incident, as described elsewhere in this Memorandum, was part of the hostile work environment faced by the plaintiff.

80) The plaintiff suffered emotional injury by being required to work in a hostile work environment.

IV.  Discussion

Given the materiality of the factual issues whether Mr.
Prestash, the District Executive, taunted and harassed the
plaintiff early in the plaintiff's employment and again years
later with comments implying the futility of advancement
aspirations on the plaintiff's part accompanied by conduct and
speech bearing derogatory racial connotations, and given the
absolute denial of Mr. Prestash of these occurrences, the
credibility of the plaintiff is a core question.  The plaintiff
was credible as to the incidents stated by the plaintiff in his
testimony.

We find that the work environment experienced by the
plaintiff would have been perceived by a reasonable person as
hostile and that the plaintiff did perceive the work environment
that he experienced in District 9-0 as hostile.  The conditions
were sufficiently severe and pervasive to create an abusive
working environment.  It was severe in that it deeply negatively
affected the plaintiff's hope and expectation that he could
advance in his engineering experience, responsibilities and
remuneration through hard work, a willingness to accept
responsibilities and educational achievements.  It was pervasive
in that, although identifiable racially offensive incidents were
not apparently frequent or normative, those that occurred ranged
in time from the outset of his District 9-0 employment to its last
days and, because racially offensive occurrences and words
emanated from supervisors, reasonably led to a perception of the

plaintiff that his race, color and national origin negatively affected his workplace status and was abusive. The workplace experienced by the plaintiff was one where he experienced discriminatory intimidation, ridicule and insult in that, in combination with circumstances demonstrating inevitable frustration of his career advancement goals, the plaintiff was taunted and insulted in a racially demeaning manner by the District Executive who had control over his advancement possibilities.

Mr. Prestash and other co-workers of the plaintiff saw him and his conduct in his earlier years in a false light. They saw his conduct as improper when it was not. Mr. Prestash, Mr. Knisely, Mr. Ayers and other District 9-0 employee who worked with the plaintiff suspected violations of workplace expectations on the part of the plaintiff in several instances. None resulted in a disciplinary action. The defendant's witnesses recounted their concern about what was being seen by "the public"; characterizing in each instance the plaintiff's conduct as something other than what the plaintiff credibly described as having occurred. The plaintiff did not pass up a meeting to sleep in his car, he was not reading a non-work related text during working hours at a job site, he did not relieve himself in public view along the road, and he was not in violation of PennDOT and District 9-0 policies concerning mileage expenses and work hours compensation. These early wrongful suspicions of misconduct were instances of workplace hostility based upon race, and were seen as such by the plaintiff.

The communications to the plaintiff from the District Executive in April of 2006, following the transfer of Mr. Hull to the position being performed by the plaintiff, "How is Uche feeling today?" and (later) "How is Uche really feeling today?", in a workplace in which Uche was the only African-American engineer, was abusive. The District Executive, knowing the plaintiff's aspirations to advance, was reasonably seen by Uche to have been expressing to Uche that the aspirations were futile.

Although not communicated to the plaintiff at the time, the reason for the selection of Mr. Hull for the position by Mr. Prestash was a part of what caused the workplace to be hostile to the plaintiff - the solving of a family relationship issue took precedence over a merit-bases promotions practice.

The two lateral transfers made by the defendant, instead of considering the plaintiff for the position the duties of which he was performing, were made in part to reduce the consequences of a family relationship among employees within a PennDOT District 9-0 working unit. The promotion was made to avoid having a supervisor supervising his brother-in-law. Addressing the consequences of a family relationship between employees resulted in the absence of any consideration of the plaintiff to fill a position for which he was ostensibly qualified and for which he would have competed if given the chance. Earlier, county maintenance managers' job experience and communication skills were seen to trump the plaintiff's education and his work experience.

The plaintiff received inadequate consideration for reasons that were not based upon qualifications and merit. That is how he came to see it in his view of his workplace, and he had reasonable cause to see it that way.

The fact of the District 9-0 panel and ratings system of promotions does not reasonably assure the selection of the most qualified candidate is important in the plaintiff's case because while his promotion disappointments were not the result of pretextual non-selections, his overall non-competitive position was the result of a promotions system hostile to persons not well known to other persons in District 9-0.

The factors given the greatest weight in the process are communication skills, team orientation and an understanding of PennDOT and District 9-0 objectives. These factors are subjective. They may be as likely in a workplace environment comprised of employees with friendship and family relationships to favor a less qualified applicant over a more qualified applicant as to result in a promotion of the most qualified person. Relationships outside of the workplace or extraneous to actual PennDOT objectives are as likely to influence selections as are more objectively important factors. The plaintiff was non-selected repeatedly. His educational accomplishments and his prior work experiences were not found in any of fifteen instances to render him the most qualified applicant. In some of the promotions decisions, panel members' explanations for selections

of candidates other than the plaintiff pointed to the plaintiff's answers to questions calling for descriptions of certain forms used in the particular job being filled. An ability to identify particular forms is not an ability that reflects good communication abilities, a good team work approach or a good ability to fulfill the PennDOT mission.[7] Nor was the identification of forms something demonstrating one's qualifications for a particular job. One would know about these forms if one had received some information about these forms and reporting requirements from someone who had done the job. The fact that this was something considered to be of importance in the promotion process was not shown by the defendant to support an inference of a selection process based upon merit and qualifications.[8]

The purpose of a Title VII remedy is to restore the employee to the economic status quo that would exist but for the employer's discriminatory conduct. *Eshelman v. Agere Systems, Inc.,* 554 F.3d 426, 440 (3d Cir. 2009). It is the employee plaintiff's burden to show the extent of the injuries that he has suffered. *Id.* at 443. The plaintiff's economic expert's analysis

---

[7] In essence, interview questions about specific job forms are like test questions. But a testing format, with study materials and a test for all applicants, was not used. When test-like questions are used in an interview format, care needs to be taken that all potential applicants have the same opportunity to prepare.

[8] The issue of the fairness of the promotions process is not of itself an issue in this case, but it is an issue that is relevant here as to the issue of workplace hostility to the plaintiff.

focused upon post-separation pay.  We do not find the plaintiff to have carried his burden of establishing that he was constructively discharged.  The plaintiff's economic expert did not analyze the income lost by the plaintiff as a result of the denial of any particular promotion(s) up until April 7, 2006.

The award of damages should compensate the plaintiff for the injuries that he suffered as the result of working for years in a racially hostile work environment.

An award of compensatory damages for emotional distress is authorized under 42 U.S.C. § 1981a(b)(3).  *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 161 (3d Cir. 1999).  In this case, finding no employment discrimination in particular promotion decisions, in the denial of the plaintiff's request for tuition, education leave or out-of-grade duties compensation, and finding that the plaintiff was not constructively discharged, and finding that the plaintiff suffered working in an work environment that was hostile to him on the basis of race, color and national origin, the emotional distress suffered by the plaintiff is the only recoverable form of damages.  The plaintiff's emotional distress was sincere and it was substantial.  It led him to feel and to decide that he would abandon the employment that he had held for ten years.  His wife testified about her husband's emotional distress, and was credible in her depiction of his state of mind as very depressed and distraught.  It affected his relationship with her and with his children in a significant and negative way.  The provocations that he described, and that we

find to be credible and to have been based upon reasonable inferences about the conduct and statements of Mr. Prestash, were such as to have caused extreme emotional distress. He took the message from the District Executive, who had been a pay range and job title peer in 1996 and had in 2006 arisen from a Pay Range 7 to a Pay Range 14 while the plaintiff remained a Pay Range 7, with control over the plaintiff's career advancement possibilities in District 9-0, to be that he, the plaintiff should not, because of who he is rather than because of his abilities and qualifications, expect to have success in career advancement efforts. For the plaintiff, who had career ambitions, a spouse who was a successful engineering professional, and children, this message that he must accept the futility of his efforts, because of his race, color and national origin, caused extreme emotional distress and an appropriate compensation amount must be determined. $75,000 dollars is an appropriate compensation amount, because it is an amount that neither minimizes the level and degree of distress experienced by the plaintiff nor constitutes an excessive award.

The plaintiff will be awarded remedial compensation for the emotional injury suffered by him in being required to work in a racially hostile work environment, one in which there was hostile racial taunting and in which there was not a fair and equal opportunity to compete for promotions. Compensation in the amount of $75,000.00 constitutes fair and just compensation for that injury.

In addition to a $75,000 award, the plaintiff shall recover attorney's fees and costs.

V.   Conclusions of Law

1)   The reasons for selecting other applicants for fifteen promotions for which the plaintiff had applied and for which he was qualified were not pretextual.

2)   The plaintiff is not entitled to recover for an employment action involving any job vacancy for which he was not selected on the basis that the employment action discriminated against him based upon race, color or national origin.

3)   The employment action involving tuition reimbursement to the plaintiff did not discriminate against him on the basis of race, color or national origin.

4)   The employment action denying leave time to the plaintiff for employment related education did not discriminate against him on the basis of race, color or national origin.

5)   The employment action denying compensation to the plaintiff for duties performed by him above and beyond those assigned to his position and pay grade did not discriminate against him on the basis of race, color or national origin.

6) Although the reason for no one promotion was pretextual, the process for promotions did not reasonably and objectively provide equal consideration to the plaintiff, an African-American engineer, and thereby gave rise to an employment condition hostile to the plaintiff.

7) Racial taunting and innuendo, and wrongful accusations, also contributed to a hostile environment to the plaintiff.

8) The plaintiff was subjected to a hostile work environment.

9) The plaintiff was not constructively discharged.

10) The plaintiff suffered injury as the result of having been subjected to a hostile work environment.

11) An award of $75,000 as compensation from the defendant to the plaintiff for the plaintiff's injuries is appropriate compensation to the plaintiff for his injuries.

12)  The defendant shall be required to pay the plaintiff's reasonable attorney fees and costs.

An appropriate order will be entered.

*/s/ J. Andrew Smyser*
J. Andrew Smyser
Magistrate Judge

Dated:  May 6, 2009.